IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EXTANG CORPORATION UNDERCOVER, INC. and LAURMARK ENTERPRISES, INC. d/b/a BAK INDUSTRIES, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 19-923 (MN) ) |
| TRUCK ACCESSORIES GROUP, LLC d/b/a LEER, INC., | ) ) ) |
| Defendant. | ) |

## MEMORANDUM ORDER

At Wilmington this 24th day of November 2020:

As announced at the hearing on September 24, 2020, IT IS HEREBY ORDERED that the disputed claim terms of U.S. Patent Nos. 9,815,358 ("the '358 Patent"), 6,893,073 ("the '073 Patent"), 7,537,264 ("the '264 Patent"), and 8,182,021 ("the '021 Patent") are construed as follows:

1. "an internal rib is positioned internally between the outer walls and . . . comprises a coupling aperture" means "an internal rib is positioned internally between the outer walls and . . . comprises a hole that engages the threaded member"[1] ('358 Patent, claim 11);

2. "to support" shall have its plain and ordinary meaning of "to hold up" with the understanding that "to hold up" means that the retaining member must hold the clamp up by itself ('073 Patent, claim 1);

3. "a clamp being positionable in a clamping position operable to couple said support frame to the sidewall of the cargo box and an unclamping position

---

[1] The parties disputed the meaning of "coupling aperture." During the hearing, the parties agreed that the coupling aperture in claim 11 is "a hole that engages the threaded member" because claim 11 itself requires a threaded member. The Court adopts this agreed-upon construction.

disengaged from the sidewall of the cargo box" means "the clamp may be either closed or open" ('073 Patent, claims 1 and 6);

4. "resilient hinge strip" means a "strip at the joint made of material that is capable of recovering original shape after deformation" ('264 Patent claims 1, 11);

5. "resilient connector" means "a connector made of material that is capable of recovering original shape after deformation" ('264 Patent claim 25);

6. "substantially flush with an upper surface of the cargo box" means "substantially level with the top of the sidewalls"[2] ('264 Patent claim 9)

7. "release mechanism" shall be given its plain and ordinary meaning ('264 Patent claims 1);

8. "latch and release assembly" shall be given its plain and ordinary meaning ('264 Patent claim 25); and

9. "spacer" shall be given its plain and ordinary meaning ('021 Patent claim 31).

In addition, for the reasons set forth below,

10. "the forward section has a single component construction between the front edge and the rear edge of the front section that is defined by the unitary extruded panel" means "the front-most section of the covering over the cargo box is an integrated part, as opposed to having a distinguishable central panel supported by frame member(s)." ('358 Patent, claim 1).

The parties briefed the issues, (*see* D.I. 67), and submitted an appendix containing intrinsic and extrinsic evidence, including an expert declaration,[3] (*see* D.I. 68). Each side submitted a tutorial describing the relevant technology. (*See* D.I. 64–66). The Court carefully reviewed all

---

[2] At the hearing, the parties agreed upon the construction of this term. The Court adopts this agreed-upon construction.

[3] Plaintiffs submitted an expert declaration of Dr. Greg Davis. Dr. Davis earned his Ph.D. in Mechanical Engineering in 1991 and is currently a Professor of Mechanical Engineering & Director of the Advanced Engine Research Laboratory at Kettering University (formerly General Motors Institute). (D.I. 68 at JA01856–84).

submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 80) and applied the following legal standards in reaching its decision.

## I. LEGAL STANDARD

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom*

3

*Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [(Patent and Trademark Office)] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely

4

to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II.   THE COURT'S RULING

The Court's ruling regarding the disputed claim terms of the '358 Patent, the '073 Patent, the '264 Patent, and the '021 Patent were announced from the bench at the conclusion of the hearing as follows:

> . . . At issue we have four patents and ten disputed claim terms.
>
> I am prepared to rule on nine of those disputes. I will not be issuing a written opinion as to those nine terms, but I will issue an order stating my rulings and will construe the term that I am not construing today in my order or later. I want to emphasize before I announce my decisions that, although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed each of the patents in dispute. I have also reviewed the portions of the prosecution history included in the Joint Appendix and the other materials in that appendix, which include definitions of various words, a brief submitted by Plaintiffs in Wisconsin, and an expert declaration of Dr. Greg Davis, also submitted by Plaintiffs. There was full briefing on each of the disputed terms. [There were also tutorials on the technology submitted by the parties.] And there has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. As an initial matter, I am not going to read into the record my understanding of claim construction law generally. I have a legal standard section that I have included in earlier opinions, including recently in *Best Medical International v. Varian Medical Systems, Inc.*, C.A. No. 18-1599. I incorporate that law and adopt it into my ruling today, and will also set it out in the order that I issue.
>
> Neither party has offered a definition of a person of ordinary skill in the art in its papers, but the parties seem to agree that there are no disputes as to who a person of ordinary skill is that are relevant to the issues before me today.

Now the disputed terms:

The first term is "the forward section has a single-component construction between the front edge and the rear edge of the front section that is defined by the unitary extruded panel" in claim 1 of the '358 Patent. I need additional time to review the arguments made today and I am not prepared to construe this term today. And I will defer my ruling.

The second term is "an internal rib is positioned internally between the outer walls and . . . comprises a coupling aperture" in claim 11 of the '358 Patent. The dispute on this term was about the meaning of coupling aperture. During the hearing today, the parties agreed that the coupling aperture in claim 11 is "a hole that engages the threaded member" because claim 11 itself requires a threaded member. I will adopt that agreed-upon construction.

The third term is "to support" in claim 1 of the '073 Patent. Plaintiffs assert that the term should be construed as "loosely suspended without user support." Defendant proposes that the term be given its plain and ordinary meaning, which they contend means "to hold up."

The crux of the dispute is whether it is necessary to specify the amount of support provided by the retaining feature to the clamp. Here, I agree with Defendant and will give the term its plain and ordinary meaning of "to hold up." To be clear, though, I construe it that way with the understanding, as confirmed by Defendant today, that to hold up means that the retaining member must hold the clamp up by itself.

This construction is consistent with the language of the claims and specification. The surrounding language of claim 1 states that "said clamp having a retaining feature engageable with said clamp retaining member so as to support said clamp from said support frame when said clamp is in said unclamping position." That language makes clear that the "retaining feature" of the claimed "clamp" engages with the "clamp retaining member" to "support" the clamp on the "support frame" when the clamp is in "an unclamping position."

The specification discusses the clamp as hanging from a support frame. For example, both the Abstract and the Summary of the Invention describe a "clamp capable of hanging from the support frame during installation." Similarly, at column 5, lines 63 to 67, the patent states "[h]ooked flange 64 is sized to cooperate with a

6

corresponding flange 72 extending upwardly from second downwardly extending portion 56 so that hanging side member 40 can hang from second downwardly extending portion 56 during installation."

Thus, I agree with Defendant that the "retaining member" itself holds up the clamp when it is unclamped.

Plaintiffs' argument relies on the statements in the specification that the "present arrangement simplifies installation of roll up tonneau system in that the clamping mechanism need not be held in place by a user with one hand while simultaneously tightening fastener with the other hand, as required in the prior art" to support its construction. But I have already made clear that the retaining member must hold the clamp up by itself, and thus there is no reason to read in "without user support" and there is nothing in that statement that Plaintiffs rely on that supports the proposed inclusion of "loosely suspended" into the claim.

The fourth term is "a clamp being positionable in a clamping position operable to couple said support frame to the sidewall of the cargo box and an unclamping position disengaged from the sidewall of the cargo box" in claims 1 and 6 of the '073 Patent. Plaintiffs assert that the term should be construed to mean "the clamp being movable along the support frame so that it can be in one place when clamped, and another when unclamped." Defendant asserts that the term should be construed as "the clamp may be either closed or open."

The dispute centers on whether the words "position" and "positionable" in claims 1 and 6 refer to locations in space or configurations of the clamp. Here, I agree with Defendant and will construe the term as "the clamp may be either closed or open."

Claims 1 and 6 indicate that the clamp is "positionable in a clamping position . . . and an unclamping position." Plaintiffs argue that because these positions are described as being "operable to couple said support frame to the sidewall of the cargo box" and "disengaged from the sidewall of the cargo box" and "support[ed] . . . from said support frame" respectively, the two positions must refer to distinct locations on the support frame. On the contrary, these descriptions of the two clamp positions disclose only that the clamp can couple the support frame to the cargo box, which is to say be closed, or else can be connected to the support claim but disengaged from the cargo box, which is to say be open.

7

Plaintiffs also point to the specification to argue that the clamp can be moved along the rail of the support frame. The structure and set up of the clamp are discussed in detail at columns 5 and 6 of the specification, which explains that components of the clamp — namely, the hanging side member and the back member — may be positioned relative to one another or relative to the inside wall.[4] Nothing in the specification suggests movement of the clamp to a different location when it changes from the clamped to unclamped positions.

Thus, I will construe the term to mean that "the clamp may be either closed or open."

The fifth term is "resilient hinge strip" in claims 1 and 11 of the '264 Patent. Plaintiffs propose that the term be given its plain and ordinary meaning or, if a construction is necessary, that it be construed as "strip at the joint comprised of material that is capable of recovering original shape after deformation." Defendant asserts that the term should be construed as "an elongated, narrow hinge made of flexible material."

The dispute here is two-fold: whether "resilient" is equivalent to "flexible" and whether the "hinge strip" must be explicitly construed as having an "elongated narrow" shape. I will construe the term as a "strip at the joint made of material that is capable of recovering original shape after deformation."

Turning first to the definition of "resilient," Plaintiffs argue that "resilient" means "capable of recovering original shape after deformation" while Defendant argues that it means "flexible." The claims teach that the "resilient hinge strip" must allow one panel to pivot relative to its neighbor. This pivoting enables the tonneau cover to fold and unfold. As explained in the specification at column 4, lines 57 through 60, when the cover is unfolded, the material of the hinge strip may be slightly compressed. For the hinge strip to return to its original form, it must be "capable of recovering original shape after deformation," which is Plaintiffs' proposed definition of "resilient."

To support [its] definition of "resilient," Defendant points to what it asserts is interchangeable usage of "flexible" and "resilient" in the specification. The example it offers is in column 4, lines 40 and 41, where the hinge strip is described as "typically made of rubber or other resilient or flexible material." Throughout the

---

4   ('073 Patent col. 6 ll. 28–33).

8

claims, however, the hinge strip is only described as "resilient," and never as "flexible." The patentee could have chosen to use the word "flexible" in the claims, but did not do so.

Finally, the extrinsic evidence Plaintiffs point to on this issue further supports my construction. Both technical and ordinary dictionaries define resilience as the ability to recover shape or form after deformation[5] as opposed to merely capable of bending or flexing.

Based on both the intrinsic and extrinsic evidence, I conclude that "resilient" is defined as "capable of recovering original shape after deformation."

Next, I turn to whether the "hinge strip" must be explicitly construed as having an "elongated, narrow" shape. Defendant's argument relies heavily on the figures in the specification, and on the specification's description that "[t]he hinge joints are typically much narrower than the panels." This constraint, however, does not appear anywhere in the claim language. In circumstances such as this, the Federal Circuit has cautioned against reading limitations from embodiments in the specification into the claims in cases such as *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) and *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). I will heed that caution.

To the extent that Defendant asserts that the word "strip" itself connotes shape, it does not seem like there is a real dispute here and I do not see a need for an explicit construction of what is readily understood from the language of the claim.

Thus, as I already mentioned, I will construe this term as a "strip at the joint made of material that is capable of recovering original shape after deformation."

The sixth term is "resilient connector" in claim 25 of the '264 Patent. Plaintiffs propose that the term be given its plain and ordinary meaning or, if a construction is necessary, that it be construed as "a connector comprised of material that is capable of recovering original shape after deformation." Defendant contends that the term should be construed in the same way as "resilient hinge strip" to mean "an elongated, narrow hinge made of flexible material."

---

[5] (D.I. 68 at JA01948–52).

9

The debate centers on whether this term, "resilient connector," should be construed to have the same meaning as the previous term, "resilient hinge strip." Here, I agree with Plaintiffs and will decline to give the same meeting to two different terms. I will instead construe this term as "a connector made of material that is capable of recovering original shape after deformation.

First, I note that it is well-established that "[d]ifferent claim terms are presumed to have different meanings."[6] Although this rule is not inflexible and can be overcome based on other principles of claim construction, Defendant is unable to overcome the rule here.

Defendant argues that, because the only resilient structure disclosed in the '264 Patent that connects panels is the resilient hinge strip, the "hinge strip" must be equivalent to the broader term "connector."[7] On the contrary, the prosecution history reveals that when the patentee amended its application to add what is now claim 25, it chose to use the term "resilient connector," which did not yet appear in the patent, rather than "resilient hinge strip," which did. This usage suggests patentee's intent to distinguish "resilient connector" from "resilient hinge strip."[8]

Thus, I decline to construe "resilient connector" to mean the same thing as "resilient hinge strip." In accordance with the definition of the term "resilient" in the previous term, however, I will construe this term as I said previously, as a "connector made of material that is capable of recovering original shape after deformation."

The seventh term is "substantially flush with an upper surface of the cargo box" in claim 9 of the '264 Patent. During the argument today, the parties agreed that the term means "substantially level with the top of the sidewalls." I will adopt that construction.

The eighth term is "release mechanism" in claim 1 of the '264 Patent. Plaintiffs propose that the term be given its plain and

---

[6] *Bd. of Regents of the Univ. of Texas Sys. v. BENQ Am. Corp.*, 533 F.3d 1362, 1371 (Fed. Cir. 2008).

[7] (D.I. 67 at ECF page ("pg.") 53 of 88).

[8] *See SimpleAir, Inc. v. Sony Ericsson Mobile Commc'ns AB*, 820 F.3d 419, 431 (Fed. Cir. 2016).

ordinary meaning or, if a construction is required, that it means "a device to release the panel." Defendant asserts that the term is subject to 35 U.S.C. § 112 ¶ 6 and that the only disclosed structure is "a release cable that is pulled to move the first and second plungers of the latch assembly."

Here, I agree with Plaintiffs and conclude that "release mechanism" is not subject to § 112 ¶ 6. First, I note that there is a rebuttable presumption against application of § 112 ¶ 6 where, as here, the word "means" is absent from the claim term. This presumption may be overcome if Defendant can show that the claim term fails to recite sufficiently definite structure or recites function without reciting sufficient structure for performing that function. Defendant has not made that showing here.

Defendant argues that the word "mechanism" as it is used in this term is a "nonce" word, and that the term claims nothing more than a mechanism or means for releasing.[9] The Federal Circuit has made clear, however, that "[m]any devices take their names from the functions they perform."[10] And indeed, courts have held that terms such as "detent mechanism,"[11] "locking mechanism,"[12] "seat pivot mechanism,"[13] and "valve mechanism"[14] are not subject to § 112 ¶ 6 when the claims describe some structural components.

Whether the claim describes sufficiently definite structure to a person of ordinary skill in the art is determined according to traditional claim construction principles, taking into account both

---

[9] (D.I. 67 at pg. 67 of 88).

[10] *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) (holding that "detent mechanism" is not subject to § 112 ¶ 6).

[11] *Greenberg*, 91 F.3d at 1583.

[12] *Unverferth Mfg. Co. v. J&M Mfg. Co.*, No. 3:16-CV-2282, slip op. at 5 (N.D. Ohio Jul. 7, 2017), *Unverferth Mfg. Co. v. Meridian Mfg.*, No. C19-4005-LTS, slip op. at 31 (N.D. Iowa Apr. 20, 2020).

[13] *Camatic Proprietary Ltd. V. Irwin Seating Co.*, No. 1:17-CV-492, slip op. at 8 (W.D. Mich. Dec. 27, 2017).

[14] *Baker Hughes Oilfield Operations, Inc. v. Production Tool Solution Inc.*, No. 1-17-CV-291, slip op. at 24 (W.D. Tex. Apr. 17, 2020).

intrinsic and extrinsic evidence.[15] Here, the claim describes the release mechanism as "releasing each panel from the first and second rails by moving the first and second plungers inwardly into release positions, wherein from the first and second plungers are withdrawn from the first and second latch channels."[16] This description suggests structural components for the release mechanism that would allow it to interact with the panels, rails, plunger, and latch channels of the slam latch assembly.[17]

The specification also indicates that the term "release mechanism" has a meaning to a person of ordinary skill in the art that conveys some structure. For example, the specification provides examples of the release mechanism's physical structure, "such as a cable, chain, bar, linkage, et cetera,"[18] and states that the release mechanism is "connected to the slam latches to release them."[19] Thus, applying traditional claim construction principles, the intrinsic evidence indicates that the claim recites sufficient structure to preclude the application of § 112 ¶ 6.

Finally, although not dispositive, the extrinsic evidence in the form of Plaintiffs' expert's opinion confirms that the term "release mechanism" is a well-known term to a person of ordinary skill in the art, particularly in the context of releasing the latch.

Thus, I conclude that "release mechanism" is not subject to § 112 ¶ 6 and construe it to have its plain and ordinary meaning.

The ninth term is "latch and release assembly" in claim 25 of the '264 Patent. Plaintiffs propose that the term be given its plain and ordinary meaning or, if a construction is required, that it means "a device on the panels used to hold and release one or more of the panels onto the rails." Defendant again asserts that this term is subject to 35 U.S.C. § 112 ¶ 6.

---

[15] *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018)

[16] ('264 Patent col. 8 ll. 28–32).

[17] *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015) (noting that claim language describing how the limitation-in-question "interacts with other components . . . might inform the structural character of the limitation-in-question or otherwise impart structure").

[18] ('264 Patent col. 5 ll. 23–24).

[19] ('264 Patent col. 5 ll. 24–26).

Here, again, I agree with Plaintiffs and conclude that "latch and release assembly" is not subject to § 112 ¶ 6.

Like the previous term, this term does not contain the word "means," which creates a rebuttable presumption that § 112 ¶ 6 does not apply. Defendant has once again failed to overcome this presumption.

Here, again, the claim language itself discloses sufficient structure. The word "latch" itself speaks to structure, not function. Additionally, the claim states that the "latch and release assembly" is located "on a bottom surface of each of the first, second and third panels" and that the assembly "automatically latches the panel into the left and right side cover rails via movement of the panels towards the side cover rails."[20] This suggests structural components that allow the latch and release assembly to interact with the rails and panels.

And, again, when applying traditional claim construction principles, the specification in the sections I referenced in connection with release mechanism indicates that latch and release has a meaning to a person of ordinary skill in the art that conveys some structure. As does the extrinsic evidence in the form of Plaintiffs' expert, who opined that "latch and release assembly," and the word "latch" in particular, is a well-known term in the field which connotes definitive structure to a person of ordinary skill in the art.

Thus, I conclude that "latch and release assembly" is not subject to § 112 ¶ 6 and will give this term its plain and ordinary meaning.

The tenth and final term is "spacer" in claim 31 of the '021 Patent. Plaintiffs contend that the term should be given its plain and ordinary meaning or, if a construction is required, that it means "an object dimensioned to allow the panels to fold flat onto each other, without stressing the hinge joints." Defendant proposes that the term be defined as a "bar made of inflexible, inelastic material dimensioned wide enough for the panels to fold flat onto each other."

The debate centers on whether a "spacer" is equivalent to a "spacer bar" and whether a "spacer" must be made of inelastic

---

[20] ('264 Patent col. 11 ll. 21–24).

>material. Here, I agree with Plaintiffs and will construe the term to have its plain and ordinary meaning.
>
>Defendant once again argues that, because there is only one type of spacer described in the specification, the more general term in the claim must be limited to the example given in the specification. Although the specification of the '021 Patent references "spacer bars" as possible embodiments, the language of the claim uses only the more general term "spacer." Absent any evidence in the claim language that a "spacer" is limited to a "spacer bar," I will not read such a limitation into the claims.
>
>Defendant's argument that a spacer must be made of "inflexible, inelastic material" is based on evidence from the prosecution history, when the patentee differentiated "elastic hinges" from the "spacer bar." As I have stated, however, a "spacer" is not limited to a "spacer bar." Thus, this limitation does not necessarily apply to all spacers.
>
>Therefore, I will construe the term as having its plain and ordinary meaning.

As noted above, the Court did not construe the term "the forward section has a single component construction between the front edge and the rear edge of the front section that is defined by the unitary extruded panel" in claim 1 of the '358 patent at the hearing. After further review of the papers submitted and the transcript of the argument, it will do so now. Plaintiffs propose that the term be given its plain and ordinary meaning or, if a construction is required, that this phrase be construed as "the front-most section of the covering over the cargo box is an integrated part, as opposed to having a distinguishable central panel supported by frame member(s)." Defendant suggests that the term means "the forward section is constructed of a unitary or single extruded panel only, with no other components between the front and rear edge, in contrast to the 'multi-component construction' of the rear sections."

The dispute centers on whether the forward section must consist of only the extruded panel. Here, the Court agrees with Plaintiffs and will construe the term to mean "the front-most section

14

of the covering over the cargo box is an integrated part, as opposed to having a distinguishable central panel supported by frame member(s)."

Claim 1 describes the forward section as having "single-component construction" in contrast to sections having "multi-component construction." The rear sections are described as having "*a multi-component construction* between the front edge and the rear edge of each rear section *that includes both a central panel and support frame members*." '358 Patent, claim 1 at col. 7 ll. 45–48 (emphasis added). The forward section, in contrast, "has a single-component construction between the front edge and the rear edge of the front section that is defined by the unitary extruded panel." '358 Patent, claim 1 at col. 8 ll. 2–5. The defining features of the multi-component construction are the "central panel and support frame members." The single-component construction must have one of those features – a central panel. Indeed, the claim states that the single-component construction "is defined by the unitary extruded panel." Thus, the claim language suggests that what distinguishes the single-component construction from the multi-component construction is the lack of the support frame members of the multi-component construction.

Dependent claim 10 also supports the Court's construction, making clear that, although the single-component construction of the forward section does not have a supporting frame, it may have other elements attached to the extruded panel. In dependent claim 10, "the forward section further comprises a first end cap attached to the first lateral end and a second end cap attached to the second lateral end." '358 Patent col. 8 ll. 41–45. It is well established that "[c]laims should be so construed, if possible, as to sustain their validity." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999) (quoting *Carman Indus., Inc. v. Wahl*, 724 F.2d 932, 937 n.5 (Fed. Cir. 1983)).

Therefore, dependent claim 10 supports that the forward section may have additional elements attached to the extruded panel, so long as there are no distinguishable frame members.

The specification also supports the Court's construction. The specification states that the forward section, unlike the rear sections, lacks a separate support frame. Specifically, it states that the design of the forward section "eliminat[es] separate frame components 37 surrounding a central panel." '358 Patent col. 6 ll. 11–12. The specification also describes how, "[b]ecause the forward panel 34 is formed of an integral element, when the remaining sections are folded into a stack 54, and the stack 54 is rotated over the forward section 34, the weight of the stack 54 is distributed over and carried by the entire panel section 34, as opposed to being mainly carried by a frame member ." '358 Patent col. 6 ll. 5–10. This emphasizes that the forward section is better able to bear the weight of the remaining sections because it is formed of a unitary panel, rather than a central panel and surrounding support frame.

Similarly, the embodiments discussed in the specification offer some further support. The specification states that, "[i]n some embodiments, the forward panel 34 can include a pair of opposite lateral side or end caps." '358 Patent col. 5 ll. 22–23. In other embodiments, the forward section includes "a bulkhead seal member 78 extending along the forward longitudinal edge 64 of the extruded panel." '358 Patent col. 5 ll. 44–45. Thus, so long as the forward section does not have a separate frame supporting the central panel, it may have auxiliary elements attached to the main extruded panel.

Finally, the prosecution history of the '358 Patent also supports the Court's construction. The prosecution history indicates that the forward section is distinguished from the "multi-component" rear sections which have separate frame members. In overcoming the prior art, the patentee explained that the present invention was distinct in that it provided "the forward section

16

of a tonneau cover <u>with a different construction</u> from that of the rear sections." (D.I. 68 at JA00049 (emphasis in original)). The patentee further noted that "both Calder and Kerr III disclose that each and every section of the tonneau cover has a <u>multi-component construction</u> that includes <u>both</u> a <u>central panel</u> and <u>additional metal support members</u>." (*Id.* (emphasis in original)). This description of the prior art uses the term "multi-component" in the same way it is used in claim 1 of the patent: to mean a section of tonneau cover with both a central panel and separate support frame. The patentee distinguished the claims from the prior art by explaining that the prior art "fail[ed] to disclose or suggest any providing [sic] the front section of the tonneau cover with a <u>single-component construction</u> between the front edge and the rear edge that is defined by the unitary extruded panel." (*Id.* at JA00049–50 (emphasis in original)).

For the foregoing reasons, the Court construes this term to mean "the front-most section of the covering over the cargo box is an integrated part, as opposed to having a distinguishable central panel supported by frame member(s)."

*[signature: Maryellen Noreika]*
The Honorable Maryellen Noreika
United States District Judge